1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,                )
                                                               )     Case No. 2:16-cr-00252-APG-NJK
8                    Plaintiff,                            )
                                                               )
9  vs.                                                     )     REPORT &  RECOMMENDATION
                                                               )
10 SCOTT ANTHONY PAULI,            )
                                                               )     (Docket No. 16)
11                    Defendant.                       )
                                                               )
12 _____)

13        This matter was referred to the undersigned Magistrate Judge on Defendant Scott Anthony

14 Pauli's Motion to Suppress Evidence.  Docket No. 16.  On January 19, 2017, and January 31, 2017,

15 the Court held an evidentiary hearing on Defendant's motion.  Docket Nos. 26, 33.  The Court has

16 considered Defendant's motion, the United States' response, Defendant's reply, the evidence

17 adduced at the evidentiary hearing on this matter, and the parties' arguments.  Docket Nos. 16, 19,

18 23, 26, 33.[1]

19 **I.     BACKGROUND**

20        **A.     Testimony of Police Officer Diasparra**

21        On July 13, 2016, Las Vegas Metropolitan Police Department (LVMPD) Police Officer

22 Vincent Diasparra was on duty in uniform, in a marked vehicle.  Hearing Tr. (1/19/2017) at 1:12

23 p.m.[2]  On that date, LVMPD Detective Bourque told Officer Diasparra that he had received

24

25        _____

26        [1]Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

27        [2]Although Officer Diasparra was wearing a body camera, he "probably" did not activate it. Hearing Tr. (1/19/2017) at 1:39 p.m.  It is LVMPD policy to activate it during a traffic stop.  Hearing
28 Tr. (1/19/2017) at 1:39 - 1:40 p.m.

information regarding a subject, Defendant Scott Pauli, who had a police officer's firearm in his possession.  Hearing Tr. (1/19/2017) at 1:12, 1:14, 1:40, 1:44 p.m.  Detective Bourque provided Officer Disaparra with Defendant's information, including his vehicle, criminal history, and location. Hearing Tr. (1/19/2017) at 1:12 - 1:13 p.m.  Additionally, Officer Diasparra conducted a records check on his computer, and found that Defendant had a prior conviction for possessing a firearm, but does not recall anything else on the criminal record.  Hearing Tr. (1/19/2017) at 1:13 p.m. Officer Diasparra did not recall when the firearm conviction occurred.  Hearing Tr. (1/19/2017) at 1:13 p.m.  On cross-examination, however, it was established that the conviction at issue was a weapons conviction, not a firearm conviction, from 2009.  Hearing Tr. (1/19/2017) at 1:44, 1:47, 2:33 - 2:34 p.m.

Detective Bourque told Officer Diasparra to stage at a location, where the officer waited for more information from Detective Bourque.  Hearing Tr. (1/19/2017) at 1:14 p.m.  Officer Diasparra understood that when and if Defendant's vehicle was mobile, he was supposed to stop it.  Hearing Tr. (1/19/2017) at 1:18, 1:41 p.m.  Officer Diasparra parked his car at Desert Inn and Sandhill because it was near where Detective Bourque was conducting surveillance.  Hearing Tr. (1/19/2017) at 1:41 - 1:42 p.m.  While Officer Diasparra waited, he spoke with Detective Bourque over the phone and the radio.  Hearing Tr. (1/19/2017) at 1:15 p.m.  During this time, Detective Bourque provided the officer with Defendant's vehicle description and plate number.  Hearing Tr. (1/19/2017) at 1:15 p.m.  The plan was for Detective Bourque to tell Officer Diasparra when the vehicle was mobile, so the officer could stop it, if there was reason to do so.  Hearing Tr. (1/19/2017) at 1:43 - 1:44 p.m. After Officer Diasparra was at the staging area for approximately a half hour to an hour, Detective Bourque stated over the radio that Defendant's vehicle was moving, and that the plate on the car was the incorrect plate, which police officers call "cold plating."[3]  Hearing Tr. (1/19/2017) at 1:16 - 1:18, 1:49 p.m.

Defendant's vehicle was traveling erratically, at a high rate of speed when Officer Diasparra came into contact with it.  Hearing Tr. (1/19/2017) at 1:19, 2:35 p.m.  He pulled the vehicle over at

---

[3]A cold plated vehicle is a vehicle that is registered to someone, but has a plate from a different vehicle on it.  Hearing Tr. (1/19/2017) at 1:17 p.m.

95 and Galleria.  Hearing Tr. (1/19/2017) at 1:20 p.m.[4]  The vehicle was stopped on the side of the road, near a dirt lot, after it exited I-95.  Hearing Tr. (1/19/2017) at 1:23 p.m.  Officer Diasparra immediately exited his car and approached the vehicle from the driver's side.  He asked Defendant, who was the driver, for his registration.  Hearing Tr. (1/19/2017) at 1:24 - 1:25, 1:57 - 1:58 p.m. The registration was valid and had the correct plate number, not the cold-plated plate number, on it. Hearing Tr. (1/19/2017) at 1:25, 1:59  p.m.  At some point, Officer Diasparra noticed that the incorrect plate was velcroed on top of the valid plate for the vehicle.  Hearing Tr. (1/19/2017) at 1:59 - 2:01 p.m.  Officer Diasparra could not recall if he asked Defendant for his driver's license.  Hearing Tr. (1/19/2017) at 2:02 p.m.

Officer Diasparra asked Defendant to exit the vehicle, which he did.  Hearing Tr. (1/19/2017) at 1:26, 2:03 p.m.  Officer Diasparra escorted Defendant to the front of his patrol car where, for officer safety, he performed a patdown for weapons.  Hearing Tr. (1/19/2017) at 1:26, 2:03, 2:05 p.m.  He did so because Detective Bourque told him Defendant was "supposed to be" in possession of a police officer's firearm and because Defendant's criminal history indicated that he "had firearms illegally."  Hearing Tr. (1/19/2017) at 1:26 - 1:27 p.m.  Also, cold plated cars "are sometimes associated to" violent crimes or violent criminals with weapons.  Hearing Tr. (1/19/2017) at 1:27 p.m.  In Defendant's right pants pocket, Officer Diasparra immediately felt what he knew to be a glass smoking pipe.  Hearing Tr. (1/19/2017) at 1:27, 2:05 p.m.[5]  Officer Diasparra handcuffed Defendant so that he could safely retrieve the pipe from Defendant's pocket.  Officer Diasparra thought the pipe was paraphernalia, though he knew that possession of a glass smoking pipe is not illegal unless it contains residue of illegal drugs, and he did not know that it contained meth residue until he pulled it out of Defendant's pocket.  Hearing Tr. (1/19/2017) at 1:28, 2:30 - 2:31 p.m.  The

---

[4]Though Officer Diasparra followed Defendant's vehicle for a time on I-95, he waited for the vehicle to exit the freeway before pulling it over.  He does not like to pull vehicles over on the freeway because it is extremely dangerous.  Hearing Tr. (1/19/2017) at 1:51 p.m.

[5]Defendant's criminal history contained a drug conviction from 2009.  Hearing Tr. (1/19/2017) at 2:33 p.m.  Defendant's criminal history also contained a March 2016 arrest for possession of drug paraphernalia, but Officer Diasparra did not recall noticing that arrest, as he paid attention only to the convictions for which Defendant was a registered felon.  Hearing Tr. (1/19/2017) at 2:39 - 2:40 p.m.

1  officer retrieved the pipe and a baggie of methamphetamine from Defendant's pocket and placed him

2  under arrest.  Hearing Tr. (1/19/2017) at 1:28 p.m.

3       Officer Diasparra contacted Detective Bourque and told him his location, what he had found

4  in Defendant's pocket, and that he had placed Defendant under arrest.  Hearing Tr. (1/19/2017) at

5  1:28 - 1:29 p.m.  Approximately five to ten minutes later, Detective Bourque arrived on the scene.

6  Hearing Tr. (1/19/2017) at 1:29 p.m.  Detective Bourque took Defendant to the back of the patrol

7  car, advised him of his *Miranda* rights, and spoke with him.  Hearing Tr. (1/19/2017) at 1:29 - 1:30

8  p.m.

9       Officer Diasparra and Detective Bourque decided to impound Defendant's vehicle.  Hearing

10  Tr. (1/19/2017) at 1:30 p.m.  They made this decision because Defendant was the owner of the

11  vehicle and was being placed under arrest.  Additionally, the vehicle was not legally parked and

12  could not be operated on a public roadway with the wrong plate.  Hearing Tr. (1/19/2017) at 1:31,

13  2:15 p.m.  Officer Diasparra did not remember if Defendant asked to turn the car over to his

14  passenger, who was over the age of 18.  Hearing Tr. (1/19/2017) at 2:15 p.m.  LVMPD policy allows

15  the person arrested to turn the car over to a licensed driver over the age of 18 rather than LVMPD

16  impounding the vehicle, if the person arrested is the registered owner of the vehicle.  Hearing Tr.

17  (1/19/2017) at 2:17 p.m.

18      **B.**    **Testimony of Detective Bourque**

19       During the summer of 2016, LVMPD Detective Stephan Bourque became aware that the

20  vehicle of a LVMPD lieutenant was burglarized sometime in April 2016.  Hearing Tr. (1/19/2017)

21  at 2:43, 3:31 p.m.  In July 2016, Detective Bourque received a phone call from a confidential

22  informant who said he had information about an individual who was in possession of stolen police

23  equipment, including a gun, taser and tactical vest.  Hearing Tr. (1/19/2017) at 2:43 - 2:44, 3:31, 3:39

24  - 3:40 p.m.  The informant was someone who had been previously arrested, which is how Detective

25  Bourque originally came in contact with him.  Hearing Tr. (1/19/2017) at 3:20 p.m.  The informant's

26  criminal history includes an arrest for false information to a police officer.  Hearing Tr. (1/31/2017)

27  at 2:09 p.m.  Detective Bourque made no effort to determine whether the informant was convicted

28  of that offense.  Hearing Tr. (1/31/2017) at 2:09 p.m.  The informant's criminal history also includes

convictions for burglary, manufacturing controlled substances, trafficking controlled substances, attempted theft, and running a forgery lab.  Hearing Tr. (1/31/2017) at 2:10 - 2:14, 2:19 - 2:21 p.m. The informant's criminal history indicates that he has been convicted of six separate felonies. Hearing Tr. (1/31/2017) at 2:19 p.m.

When Detective Bourque first met the informant, he told the informant to call him if he wanted to do any work, and gave him his phone number.  Hearing Tr. (1/19/2017) at 3:22 p.m. When he was subsequently contacted by the informant with the information regarding Defendant, Detective Bourque did not offer any money for his information, or make any promises that he would be paid.  Hearing Tr. (1/19/2017) at 3:23, 3:43 - 3:44 p.m. Detective Bourque registered the informant as a confidential informant specifically for this case, this was the first time Detective Bourque used this person as an informant, and the informant was paid for his work "after the fact." Hearing Tr. (1/19/2017) at 3:20, 3:22, 4:07 p.m.  Detective Bourque no longer works with this informant.  Hearing Tr. (1/19/2017) at 3:20 p.m.

The informant directed the detective to the specific address where Defendant Pauli lived, and gave particulars about Defendant himself, including his criminal history, his address, and who he was dating.  Hearing Tr. (1/19/2017) at 2:44 - 2:45, 4:09 p.m; Hearing Tr. (1/31/2017) at 2:16 p.m. After receiving the information from the informant, Detective Bourque tracked down the event number from the burglary of the lieutenant's vehicle to see what items had been taken, and found them to be consistent with the information given by the informant.  Hearing Tr. (1/19/2017) at 2:45 p.m.  He then conducted a records and background check into Defendant and found that Defendant matched the information provided by the informant, including convictions for felonies.  He also found a connection between Defendant and the residence address given to him by the informant. Hearing Tr. (1/19/2017) at 2:45 - 2:46, 2:47 p.m.  Detective Bourque believed that the stolen items the confidential informant spoke of could be the items taken from the lieutenant's vehicle.  Hearing Tr. (1/19/2017) at 2:47 p.m.  He also checked social media, and determined that Defendant appeared to be in a relationship consistent with the information given by the informant.  Hearing Tr. (1/19/2017) at 2:47 p.m.  Detective Bourque also determined that Defendant's apparent girlfriend

1   lived at the address given by the informant, and therefore deduced that Defendant could be living

2   there as well.  Hearing Tr. (1/19/2017) at 2:48 p.m.

3          The informant told Detective Bourque that Defendant drove a silver Cadillac, which he used

4   to commit crimes.  The informant also said that Defendant changed the plates on his vehicle in an

5   effort to conceal the identity of the vehicle.  Hearing Tr. (1/19/2017) at 2:48 p.m.  Detective Bourque

6   was able to confirm that Defendant was a registered owner of a vehicle that matched the description

7   given by the informant, but did not confirm that the vehicle was used to commit crimes.  Hearing

8   Tr. (1/19/2017) at 2:49, 4:22 p.m.  Detective Bourque believed that Defendant was in possession of

9   property stolen from the lieutenant, partially because the informant said the property was stolen from

10  a nice neighborhood and the lieutenant lived in Summerlin, and  partially because he was able to

11  corroborate the information the informant gave him about Defendant.  Hearing Tr. (1/19/2017) at

12  2:49 - 2:50, 4:22 p.m.  Further, Detective Bourque believed that Defendant's burglary conviction

13  shows that he is predisposed to commit "that type of crime."  Hearing Tr. (1/19/2017) at 3:09 p.m.

14  Detective Bourque does not recall whether he asked the informant if the informant was involved in

15  the crime in any way, or had any of the stolen equipment.  Hearing Tr. (1/19/2017) at 4:08 p.m.

16         On July 13, 2016, Detective Bourque set up surveillance on Defendant's residence.  Hearing

17  Tr. (1/19/2017) at 2:50, 2:52 p.m.; Hearing Tr. (1/31/2017) at 1:41 p.m.  He did not keep

18  surveillance logs, but documented the times of the surveillance in his officer's report.  Hearing Tr.

19  (1/19/2017) at 3:18 p.m.  Detective Bourque watched the house, hoping that if Defendant left and

20  the detective saw a crime, he could stop him and further his investigation.  Hearing Tr. (1/19/2017)

21  at 2:52 p.m.  During the surveillance, he saw Defendant's vehicle leave the garage of the residence

22  and travel through an alley at a high rate of speed, and he saw it fail to yield.  Hearing Tr.

23  (1/19/2017) at 2:52 - 2:53 p.m.  Detective Bourque stayed at the residence to surveil it, but noticed

24  that the vehicle had an incorrect plate on it.  Hearing Tr. (1/19/2017) at 2:53 p.m.  He called into

25  records to have the plate checked, and determined that the plate on Defendant's vehicle was

26  registered to a different vehicle.  Hearing Tr. (1/19/2017) at 3:13 p.m.  Detective Bourque relayed

27  the information that the vehicle was cold plated, as well as the information as to the direction the

28  vehicle was heading, to Officer Diasparra.  Hearing Tr. (1/19/2017) at 2:54 - 2:55 p.m.  When

- 6 -

1   Detective Bourque established surveillance on the residence, he knew that he wanted to have a

2   uniform police officer in a marked vehicle available for a traffic stop if and when the vehicle left the

3   residence, for officer safety.  Hearing Tr. (1/19/2017) at 2:56 p.m.

4         Detective Bourque had already explained the investigation on which he was working to

5   Officer Diasparra.  Hearing Tr. (1/19/2017) at 2:56 p.m.  Detective Bourque hoped to be able to stop

6   Defendant's vehicle, find probable cause to arrest Defendant, and arrest him.  He further hoped that

7   Defendant would explain that the stolen items were inside his residence.  Hearing Tr. (1/31/2017)

8   at 1:53 - 1:54 p.m.  Detective Bourque told Officer Diasparra that the investigation involved an

9   officer's gun and taser, and that he believed the suspect was Defendant Pauli.  Hearing Tr.

10  (1/19/2017) at 2:56 p.m.  He told Officer Diasparra that Defendant had an extensive criminal history,

11  and that he was a five-time convicted felon, including a firearm conviction, a burglary, and drug-

12  related offenses.  Hearing Tr. (1/19/2017) at 2:56 - 2:57, 3:08 p.m.[6]

13        Detective Bourque had also observed on social media that Defendant was in great shape, so

14  he wanted Officer Diasparra to know that Defendant was potentially armed with a police officer's

15  gun or taser, and had been stopped with firearms before.  Hearing Tr. (1/19/2017) at 2:57 p.m.  The

16  information given to Detective Bourque by the informant, however, was that Defendant had the gun

17  at the house, not in his vehicle.  Hearing Tr. (1/19/2017) at 3:57 - 3:59 p.m.  Detective Bourque

18  never asked the informant if Defendant carries a gun on his person.  Hearing Tr. (1/19/2017) at 4:02 -

19  4:03 p.m.  Detective Bourque, made numerous comments during the hearing regarding what he

20  thought about Defendant's possession of a gun during the traffic stop.  Detective Bourque believed

21  it was "possible" that Defendant had a gun in the vehicle.  Hearing Tr. (1/19/2017) at 4:00 p.m.  He

22  "assume[d] that someone who has a gun that was stolen, they could potentially carry it."  Hearing

23  Tr. (1/19/2017) at 4:03 p.m.  Detective Bourque "assumed that the gun was - it's possible it could

24  be [in the vehicle] or not there."  Hearing Tr. (1/19/2017) at 4:03 p.m.  "I assumed that [Defendant]

25  could potentially be armed with a firearm."  Hearing Tr. (1/19/2017) at 4:33 p.m.  "I would not know

26  if [Defendant] was going to have a gun on him."  Hearing Tr. (1/19/2017) at 4:36 - 4:37 p.m.

27

28        [6]Detective Bourque noted that, although the SCOPE says Defendant's conviction is for a
    weapons charge, he presumed it to be a firearm.  Hearing Tr. (1/19/2017) at 4:06 p.m.

- 7 -

Detective Bourque knew, from the informant, when the vehicle would be leaving the residence. Hearing Tr. (1/31/2017) at 1:46 p.m. The informant said that Defendant was going to go out and commit crimes with checks that day. Hearing Tr. (1/31/2017) at 1:47 p.m. When the vehicle started moving, Detective Bourque put the information that the vehicle was moving out over the radio. Hearing Tr. (1/19/2017) at 4:23 p.m. Detective Bourque also told Officer Diasparra that the vehicle was cold plated. Hearing Tr. (1/19/2017) at 2:58 p.m. Detective Bourque told Officer Diasparra to be safe while stopping the car due to all of the information he had about Defendant. Hearing Tr. (1/19/2017) at 2:58 p.m. Before the vehicle left the residence, Detective Bourque told Officer Diasparra he wanted him to conduct a vehicle stop on Defendant's vehicle. Hearing Tr. (1/19/2017) at 2:59 p.m.

Detective Bourque arrived on the scene approximately 25 - 30 minutes after the vehicle stop. Hearing Tr. (1/19/2017) at 3:00 p.m. When he arrived on the scene, he recognized Defendant. Hearing Tr. (1/19/2017) at 3:00 p.m. Detective Bourque made the decision to arrest Defendant, based on the information the Officer Diasparra relayed to him. Hearing Tr. (1/19/2017) at 3:01 p.m. By the time Detective Bourque arrived on the scene, Defendant was already in handcuffs and under arrest, but Detective Bourque took over and made the official arrest. Hearing Tr. (1/19/2017) at 3:10 - 3:11 p.m. The passenger was also in handcuffs when Detective Bourque arrived on the scene. Hearing Tr. (1/19/2017) at 4:38 p.m.

Detective Bourque then conducted an inventory of Defendant's vehicle. Hearing Tr. (1/19/2017) at 3:02 p.m. He inventoried the vehicle due to the fact that he determined he was going to tow the vehicle because it was cold plated, parked on the side of the road, Defendant had no proof of insurance, and Defendant was arrested for possession of meth. Hearing Tr. (1/19/2017) at 3:02, 3:04 p.m. Detective Bourque noted, however, that the vehicle's registered plate was located underneath the fictitious plate. Hearing Tr. (1/19/2017) at 3:48 p.m. He further stated that he did not call in or check on the computer whether Defendant had appropriate insurance, just that he did not see the actual insurance card. Hearing Tr. (1/19/2017) at 3:49 - 3:50, 4:31 - 4:32 p.m; Hearing Tr. (1/31/2017) at 1:51 p.m. The passenger was present on the scene until after the vehicle was searched, but Detective Bourque could not recall if the passenger possessed a valid driver's license,

1   or even if he checked whether the passenger possessed a valid driver's license.   Hearing Tr.

2   (1/19/2017) at 3:50 - 3:51, 4:26 - 4:27 p.m.

3          After the vehicle was impounded, Detective Bourque interviewed Defendant and, among

4   other things, asked about some of the items in the vehicle.   Some of the items in Defendant's vehicle

5   were items that had been stolen from the lieutenant's vehicle.   Hearing Tr. (1/19/2017) at 3:03 p.m.

6   Detective Bourque would have been surprised if all of the stolen items were in the vehicle.

7   "Sometimes it's there, sometimes it isn't there when we're doing investigations."   Hearing Tr.

8   (1/19/2017) at 3:53 p.m.

9          After completing the vehicle inventory, where officers found two forged identification cards,

10   a forged check, and some of the missing police equipment, Detective Bourque went to Defendant's

11   residence.   Hearing Tr. (1/19/2017) at 3:04 p.m.; Docket No. 16-1 at 5, 11.   He applied for, and

12   obtained, a telephonic search warrant for Defendant's residence.   Hearing Tr. (1/19/2017) at 3:04

13   p.m.   In applying for the search warrant, Detective Bourque relied upon the information received

14   from the informant, the records checks he conducted on that information, the stop of Defendant,

15   Defendant's statement, observations made during surveillance, the amount of methamphetamine

16   found on Defendant's person, and the items found in his vehicle during the vehicle inventory.

17   Hearing Tr. (1/19/2017) at 3:04 - 3:05 p.m.   Detective Bourque did not include information in his

18   search warrant affidavit regarding the criminal history or the reliability of the informant.   Hearing

19   Tr. (1/19/2017) at 3:29 - 3:30 p.m.; Docket No. 16-1 at 2-7.   He generally tries to establish probable

20   cause in search warrant affidavits independently of the informant.   Hearing Tr. (1/19/2017) at 3:30

21   p.m.

22   **II.     ANALYSIS**

23          **A.     Credibility of Witnesses**

24          The Court ordered an evidentiary hearing in order to make an accurate determination of what

25   occurred in the instant case and how the facts relate to the applicable caselaw.   "The longstanding

26   and repeated invocations in caselaw of the need of district courts to hear live testimony so as to

27   further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live

28   testimony is the bedrock of the search for truth in our judicial system."   *United States v. Thoms*, 684

F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof."  *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted).  *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility.  Having done so, the Court finds that both Officer Diasparra and Detective Bourque testified credibly.

### B.     Traffic Stop

Defendant does not contest the validity of the traffic stop itself.  *See, e.g.*, Docket No. 23 at 4.  Further, the testimony clearly demonstrated that Defendant's vehicle was traveling at a high rate of speed.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "Because stopping an automobile and detaining its occupants, 'even if only for a brief period and for a limited purpose,' constitutes a 'seizure' under the Fourth Amendment, an official must have individualized 'reasonable suspicion' of unlawful conduct to carry out such a stop." *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996), and *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)); *see United States v. Lopez–Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (holding that an investigative traffic stop requires reasonable suspicion, not probable cause).

Officers may conduct a traffic stop if they have reasonable suspicion that a person is committing, or is about to commit, a crime, including a traffic violation. *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).  "Reasonable suspicion" must be informed by specific, articulable facts, along with objective and reasonable inferences.  *Id*.

1      "[T]he constitutionality of a traffic stop does not depend on the subjective motivation or

2  intent of the officers." *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir.2000) (citing *Whren*,

3  517 U.S. at 813).  Therefore, "[t]he fact that the alleged traffic violation is a pretext for the stop is

4  irrelevant, so long as the objective circumstances justify the stop." *Id.*

5      The testimony clearly established that Defendant was traveling at a high rate of speed, and

6  that he failed to yield.  The Court therefore finds that the traffic stop was valid.

7          **C.      Order for Defendant to Exit Vehicle**

8      Defendant submits that Officer Diasparra improperly ordered him to exit the vehicle.[7]  The

9  United States contends that Officer Diasparra acted properly.  Docket No. 19 at 5-6.

10     When "a motor vehicle has been lawfully detained for a traffic violation, the police officers

11  may order the driver to get out of the vehicle without violating the Fourth Amendment, ... because

12  the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis'*

13  additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Arizona v.*

14  *Johnson*, 555 U.S. 323, 325 (2009).  *See also Maryland v. Wilson*, 519 U.S. 408, 410 (1997)

15  (internal citation omitted) (an officer "may as a matter of course order the driver of a lawfully

16  stopped car to exit his vehicle...."); *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005)

17  (citing *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)) ("it is well established that an officer

18  effecting a lawful traffic stop may order the driver and the passengers out of a vehicle")

19     Accordingly, the Court finds that Officer Diasparra appropriately ordered Defendant and his

20  passenger to exit the vehicle during the lawful traffic stop.

21         **D.      Patdown**

22     Defendant submits that Officer Diasparra had no basis to conduct a patdown of Defendant.

23  Docket No. 16 at 7-8.  He notes that Detective Bourque's report indicates that Officer Diasparra

24  conducted the patdown "based off of the previous history and circumstances surrounding the

25  vehicle."  *Id.* at 8.  Further, Defendant submits that his prior felony convictions are not sufficient to

26

27     _____

28     [7]Defendant's motion to suppress indicates that does not contest the legality of Officer Diasparra's order to exit the vehicle.  Docket No. 16 at 7.  At the beginning of the evidentiary hearing, however, his counsel indicated that Defendant does, in fact, contest the legality of the order.

1    provide reasonable suspicion that he was presently armed and dangerous.  *Id*. at 8-9.  Finally,

2    Defendant contends that the information received indicates that Defendant possessed a firearm at his

3    residence, and not on his person.  *Id*. at 9.

4         The United States responds that Officer Diasparra had reasonable suspicion to conduct the

5    patdown "due to the fact that the vehicle was cold-plated and as a result of the Defendant's extensive

6    criminal history."  Docket No. 19 at 8.  The United States further submits that Defendant "was

7    properly patted down for weapons based off the circumstances surrounding this vehicle and the

8    Defendant's involvement in the burglary of a LVMPD Lieutenant's firearm and his known criminal

9    history."  *Id*.  In support of its argument, the United States cites only to one case, *United States v.*

10   *Davis*, 636 F.3d 1281 (10th Cir. 2011).  In addition to the fact that this case is from the Tenth

11   Circuit, the facts of the case do not include a patdown of the driver or passenger of the vehicle, and

12   the case does not address the standards related to a patdown in any way.  *Id*.

13        Defendant replies that Officer Diasparra did not possess reasonable suspicion that Defendant

14   was armed and presently dangerous.  Docket No. 23 at 5-7.  Defendant outlines the facts in the

15   instant case to demonstrate that they do not rise to the level of reasonable suspicion.  *Id*.  Defendant

16   therefore asks the Court to suppress all evidence obtained as a result of his patdown.  *Id*. at 7.

17        A patdown of a person for weapons requires reasonable suspicion that the person "is armed

18   and presently dangerous to the officer or to others."  *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir.

19   2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).  "A lawful frisk does not always flow from

20   a justified stop."  *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).  To the contrary, each

21   element, "the stop and the frisk, must be analyzed separately, the reasonableness of each must be

22   independently determined."  *Thomas*, 818 F.3d at 876.

23        In order to establish reasonable suspicion that a person is presently armed and dangerous for

24   the purpose of justifying a patdown, "the police officer must be able to point to specific and

25   articulable facts which, taken together with rational inferences from those facts, reasonably warrant

26   that intrusion."  *Id*. (quoting *Terry*, 392 U.S. at 21).  "A mere inchaoate and unparticularized

27   suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion."

28   *Id*. (internal citation omitted).

To determine whether reasonable suspicion existed at the time of the patdown, a Court considers the "totality of the circumstances surrounding the stop." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010). "Reasonable suspicion is an objective standard, asking whether a reasonably prudent person would have been warranted in believing the suspect was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." *Thomas*, 818 F.3d at 876.

Reasonable suspicion to justify a patdown or frisk is analyzed objectively under the "totality of the circumstances surrounding the stop," and in light of the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (quoting *United States v. Hall*, 974 F.2d 1201, 1204 (1992)). The crime of which the person is suspected is relevant, as can be the location and time of day. *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) (finding relevant the fact that the frisk occurred "on a remote section of road at midnight" and was of a nighttime burglary suspect). Other factors that have been found relevant include nervous or aggressive behavior, bulges in an individual's clothing, and association with gang members or other criminals. *See Tuttelman v. City of San Jose*, 420 Fed.Appx. 758, 761 (9th Cir. 2011) (citing cases); *United States v. Montes*, 343 Fed.Appx. 288, 288 (9th Cir.2009). Additionally, although "a prior criminal history alone cannot establish reasonable suspicion ... it is permissible to consider such a fact as part of the total calculus of information." *Burrell v. McIlroy*, 464 F.3d 853, 858 n. 3 (9th Cir. 2006).

It is well established that the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches and seizures. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). Evidence obtained by such illegal action of the police is "fruit of the poisonous tree," warranting application of the exclusionary rule if, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (*en banc*) (citing *Brown v. Illinois*, 422 U.S. 590, 599 (1975)). The exclusionary rule requires a causal connection between the illegal conduct and the evidence sought to be suppressed. *Crawford*, 372 F.3d at 1054. "When there is a

close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts." *Dunaway v. New York*, 442 U.S. 200, 218 (1979).   Whether the twin aims of deterrence and judicial integrity warrant application of the exclusionary rule depends largely on the facts of each case.  *Brown*, 422 U.S. at 603.

In determining whether the taint has been sufficiently purged, the Ninth Circuit asks "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Millan*, 36 F.3d 886, 890 (9th Cir. 1994) (internal quotation marks omitted).

In this instance, Detective Bourque initially observed Defendant traveling at a high rate of speed and failing to yield in a residential area.  He decided not to stop the vehicle at that time and, instead, contacted Officer Diasparra with Defendant's whereabouts.  Officer Diasparra followed Defendant for a period of time, and eventually decided to stop his vehicle by the side of the road. The stop occurred at nighttime, but there is no indication that it occurred in a remote location. Additionally, no testimony was elicited that Defendant engaged in nervous or aggressive behavior; that he had suspicious bulges in his clothing; or that he was a gang member or one who associated with violent criminals.

Officer Diasparra conducted the patdown because Defendant was "supposed to be" in possession of a police officer's firearm and because Defendant's criminal history indicated that he "had firearms illegally."  Also, cold plated cars "are sometimes associated to" violent crimes or violent criminals with weapons.

Defendant's criminal record indicated that he had a weapons conviction from 2009, as well as some other nonviolent convictions.  Detective Bourque's investigation into Defendant involved police equipment, including a handgun, that had been stolen three months earlier.  The information given to Detective Bourque was that Defendant possessed the handgun inside his residence. Detective Bourque had been given no information that Defendant engaged in violent crimes, that he had a habit of carrying a gun on his person, or that he was carrying a gun on his person that night.

When asked about this issue at the hearing, Detective Bourque testified that he believed it was "possible" that Defendant had a gun in the vehicle. He also testified that the "assume[d] that someone who has a gun that was stolen, they could potentially carry it." Detective Bourque "assumed that the gun was - it's possible it could be [in the vehicle] or not there." He also testified that he "assumed that [Defendant] could potentially be armed with a firearm," and that he "would not know if [Defendant] was going to have a gun on him."

Neither Officer Diasparra nor Detective Bourque had reasonable suspicion to believe that Defendant was armed at the time of the stop of the vehicle. Additionally, neither one ever testified that they believed Defendant was presently dangerous to himself or other officers, even if he had been armed. Accordingly, the Court finds that the patdown of Defendant was unlawful. The Court further finds that the glass pipe and methamphetamine recovered from the patdown are the fruits of that unlawful patdown. These fruits cannot be sufficiently distinguished from the patdown to purge the evidence of its primary taint.[8]

### E.    Inventory Search of Vehicle

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S.CONST.AMEND. IV. Since warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search and seizure falls within an exception to the Fourth Amendment's warrant requirement. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Evidence obtained in violation of the Fourth Amendment, including any "fruit of the poisonous tree," must be suppressed. *Id.*

"Inventory searches have been held constitutional if they are conducted in accordance with the standard procedures of the agency conducting the search or come under another exception to the Fourth Amendment warrant requirement." *United States v. Ramos-Oseguera*, 120 F.3d 1028, 1036 (9th Cir. 1997). Once a vehicle has been legally impounded, the police may conduct an inventory

---

[8]Defendant also argues that Officer Diasparra improperly extended the stop. Docket No. 16 at 6. The Court need not reach this issue, however, as the Court has determined that the patdown was not lawful.

search, as long as it conforms to the standard procedures of the local police department. *South Dakota v. Opperman,* 428 U.S. 364, 375–76 (1976); *see also United States v. Wanless,* 882 F.2d 1459, 1463 (9th Cir.1989). Inventory procedures protect an owner's property while it is in the custody of the police, insure against claims of lost, stolen, or vandalized property, and guard the police from danger. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

In this case, Detective Bourque and Officer Diasparra conducted the inventory search on Defendant's vehicle because they decided to impound the vehicle after arresting Defendant. The Court, however, has determined that the patdown was unlawful and the pipe and methamphetamine for which Defendant was placed under arrest were fruits of that unlawful patdown. Therefore, Defendant's no evidence remains for which Defendant could have been arrested at that time. As the inventory search occurred due to the arrest, the Court finds that it was unlawful. The evidence recovered from the vehicle due to the unlawful inventory search is fruit of the unlawful inventory search.[9]

**F.      Search Warrant of Residence**

Defendant submits that the search warrant application submitted by Detective Bourque relied exclusively on information from the informant and evidence discovered from the search of Defendant's person and vehicle. Docket No. 16 at 14. Defendant submits that, since the evidence discovered during the patdown and search of the vehicle were unlawfully obtained, they cannot contribute to the probable cause determination; therefore, the sufficiency of the affidavit depends entirely on information provided by the informant. *Id.* Despite this fact, Defendant contends, the affidavit provided no information that could give the issuing judge a basis on which to determine that the informant was reliable. *Id.* at 14-15. Defendant therefore submits that the warrant lacks probable cause and was improperly issued, and that the gun found at Defendant's residence should be suppressed. *Id.* at 15.

---

[9]There was also testimony about LVMPD's policies regarding towing vehicles. The Court need not reach the issue of whether the officers violated LVMPD's policy, which would also invalidate the inventory search, as the Court determines that the inventory search was invalid for an independent reason.

In response, the United States submits that the judge who issued the search warrant had a substantial basis for concluding that Detective Bourque's affidavit established probable cause. Docket No. 19 at 10.  The United States submits that corroboration of an informant's information "by independent police work is of significant value," and that Detective Bourque corroborated the informant's information "in major part." *Id*.  The United States submits that the informant provided accurate information about Defendant's "criminal history, residential location, relationship status, make and model of the vehicle he owned, and involvement in the burglary of [the] Lieutenant's police equipment, as well as the timeframe of the burglary." *Id*. at 10-11.  Further, the United States submits that Courts should give deference to the issuing court, and that the state court judge in this instant case "had an opportunity to listen to Detective Bourque's extensive, detailed Search Warrant Declaration." *Id*. at 11.  The United States therefore submits that there "is no reason to question" the issuance of the search warrant, and asks the Court to deny Defendant's motion.  *Id*. at 11-12.

In reply, Defendant submits that the search warrant affidavit contains tainted information - the evidence unlawfully recovered from the car stop.  Docket No. 23 at 10.  When an affidavit contains tainted information, Defendant submits, the reviewing court must strike that information and analyze whether the remaining information constitutes probable cause without the usual deference owed to the issuing court.  *Id*.  Defendant contends that the remaining information fails to establish probable cause to search his residence and, therefore, asks the Court to grant his motion. *Id*. at 11-13.

The probable cause standard for a search warrant is whether, based on common sense considerations, there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The issuing judge need not determine "that the evidence is more likely than not to be found where the search takes place.... The [judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (citation and internal quotation marks omitted).  Neither certainty nor a preponderance of the evidence is required. *United States v. Kelley*, 482 F.3d 1047,

1    1050–51 (9th Cir. 2007) (citing *Gates*, 462 U.S. at 246 and *United States v. Gourde*, 440 F.3d 1065,

2    1069 (9th Cir. 2006) *(en banc)*).

3          Probable cause is "a fluid concept turning on the assessment of probabilities and the

4    particular factual context not readily, or even usefully, reduced to a neat set of legal rules," and its

5    existence must be determined by an analysis of the totality of the circumstances surrounding the

6    intrusion.  *Gates*, 462 U.S. at 232.  Probable cause does not deal with hard certainties, but with

7    probabilities.  *Id*. at 241; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (probable

8    cause deals with "probabilities" which are not technical, but factual and practical considerations of

9    everyday life on which reasonable and prudent people, not legal technicians act).  As noted above,

10   the Supreme Court defines probable cause to search as "a fair probability that contraband or evidence

11   of a crime will be found in a particular place."  *Gates,* 462 U.S. at 238.  An issuing judge's

12   determination of probable cause in a search warrant affidavit is paid great deference by a reviewing

13   court.  *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011).

14         When some of the evidence included in a search warrant affidavit is tainted, that taint alone

15   does not render the search warrant invalid.  *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir.

16   2014) (internal citation omitted).  Instead, the warrant will remain valid if, after excising the tainted

17   evidence, the affidavit's "remaining untainted evidence would provide a neutral magistrate [judge]

18   with probable cause to issue a warrant."  *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)

19   (internal quotation omitted).  Thus, after excising the glass pipe and methamphetamine found on

20   Defendant's person and the items found in his vehicle, this Court must determine whether the

21   remaining untainted evidence was sufficient to support issuance of the warrant.  That determination

22   is made without the usual deference owed to the issuing judge's initial finding of probable cause.

23   *Kelley*, 482 F.3d at 1051.

24         In determining probable cause for a search warrant affidavit that relies upon information

25   given by an informant, the issuing judge "should consider an informant's veracity, reliability and

26   basis of knowledge."  *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) (internal

27   quotation omitted).  The totality of the circumstances approach "permits a balanced assessment of

28   the relative weights of all the various indicia of reliability (and unreliability)" surrounding

1   informants' tips. *Gates*, 462 U.S. at 234. Even if the reliability of a confidential source is not clearly

2   established, the credibility of the statement is "enhanced" when the statement gives a detailed

3   account of events that is corroborated by the statements of other confidential informants. *Alvarez,*

4   *358 F.3d at 1203. See also United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1566 (9th

5   Cir.1989) ("Although the reliability of several of [the] confidential sources was not clearly

6   established, the detailed nature of many of their statements and the interlocking nature of their stories

7   enhanced their credibility").

8          In determining whether probable cause existed for the issuance of the search warrant, a court

9   must consider the credibility of the informant, including his history of providing reliable information

10  in previous investigations and any prior criminal convictions for crimes of dishonesty. *United States*

11  *v. Martinez-Garcia*, 397 F.3d 1205, 1216 (9th Cir. 2005); *United States v. Reeves*, 210 F.3d 1041,

12  1045 (9th Cir. 2000). The Court must also examine whether the information given by the informant

13  was bolstered by independent police investigation of the tip or corroboration by other confidential

14  informants. *Martinez-Garcia*, 397 F.3d at 1216; *Alvarez*, 358 F.3d at 1203; *United States v. Bishop*,

15  264 F.3d 919, 925–926 (9th Cir. 2001).

16         When the Court excises all information regarding the items recovered from Defendant's

17  person and vehicle from the search warrant affidavit, all that remains is the information given by the

18  informant and Detective Bourque's corroboration of said information. Docket No. 16-1 at 2-7. The

19  affidavit is silent, however, regarding the informant's reliability, veracity, and basis of knowledge.

20  *Id*. Additionally, the affidavit fails to inform the issuing court that the informant has prior felony

21  convictions and prior convictions for crimes of dishonesty. *Id*. Further, the majority of the

22  information that Detective Bourque was able to corroborate was information regarding easily

23  observable actions of Defendant, including his vehicle, his residence, and his girlfriend. The other

24  information - that regarding burglary and forgery - involved the types of crimes for which the

25  informant also had convictions, but the issuing judge was never made aware of this information.

26  Considering the totality of the circumstances of the remaining information in the affidavit, including

27  the lack of information regarding the reliability and veracity of the informant, the informant's

28  criminal record, and the fact that the information about Defendant was the type readily known by

anyone who knew him, and the lack of deference to the issuing court, the Court finds that probable cause did not exist for the issuance of the search warrant for Defendant's residence.

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's Motion to Suppress Evidence, Docket No. 16, be **GRANTED**.

IT IS FURTHER RECOMMENDED that the Court suppress the glass pipe and bag of methamphetamine found on Defendant's person, the items found in his vehicle, and the gun found in his residence.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 14th day of February, 2017.


NANCY J. KOPPE
United States Magistrate Judge